# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG

**MARK JENKINSON,**

    Plaintiff,

**v.**                                      **CIVIL ACTION NO.: 3:19-CV-83 (GROH)**

**HIGHMARK WEST VIRGINIA, INC.**

    Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

On May 30, 2019, the parties in the above-styled civil action appeared before the Court for a hearing on the Plaintiff's request for a preliminary injunction. ECF No. 1 at 8. Lawrence M. Schultz appeared on behalf of the Plaintiff, Mark Jenkinson. Mr. Jenkinson was also present via telephone. Jill E. Hall appeared on behalf of the Defendant, Highmark West Virginia, Inc., doing business as Highmark Blue Cross Blue Shield West Virginia ("Highmark"). After reviewing the parties' filings, considering the evidence presented and carefully analyzing the controlling law, the Court **GRANTS** the request for a preliminary injunction for the reasons provided herein.

## I. Background

This civil action arises from Highmark's decision that Mr. Jenkinson's continued stay at Magee Rehabilitation Hospital is not medically necessary, and therefore, not covered under Mr. Jenkinson's health insurance plan. The background of the dispute is as follows.

Highmark operates as an employer sponsored health insurance plan which is governed under the terms of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Mr. Jenkinson is a plan participant in an employee health insurance plan that is insured by Highmark ("the Plan").

Mr. Jenkinson is a paraplegic who suffered a spinal cord injury approximately three decades ago. Recently he injured his left shoulder. On April 9, 2019, Mr. Jenkinson underwent rotator cuff surgery to repair his shoulder. The surgery rendered him unable to care for himself and triggered the need to be placed in a rehabilitation center that specializes in spinal cord injuries.

Prior to the surgery, Mr. Jenkinson sought Highmark's approval for admission to Magee Rehabilitation Hospital in Philadelphia, Pennsylvania ("Magee"). Magee specializes in the care, treatment and rehabilitation of individuals with spinal cord injuries. In support of his request, Mr. Jenkinson submitted four letters from physicians who recommended his direct admission to Magee.

In a letter dated February 27, 2019, Dr. Joseph Abboud, Mr. Jenkinson's orthopedic surgeon who performed the surgery in Philadelphia, opined Mr. Jenkinson needed to go specifically to Magee post-surgery until he was able to do transfers with the arm. Dr. Abboud informed Highmark, prior to the surgery, the rehabilitation at Magee could last four months.

In a letter dated March 14, 2019, Dr. John A. Bruno opined Mr. Jenkinson's surgery would require lengthy hospitalization in a facility that regularly cares for spinal cord injuries and paraplegics and strongly recommended Magee. Dr. Bruno warned admission to a standard skilled nursing home would place Mr. Jenkinson at high risk for

many complications which spinal cord injury patients face, such as bowel, bladder and skin issues. Dr. Bruno also explained Mr. Jenkinson faces a high risk of falling during rehabilitation since he is unable to transfer himself between bed and wheelchair.

In a March 13, 2019 letter, Dr. Justin Glassford, Mr. Jenkinson's primary physician, stated Mr. Jenkinson would greatly benefit from post-surgical placement at Magee. Dr. Glassford agreed with Dr. Bruno's concerns for health and safety risks faced in a non-specialized nursing home. Dr. Glassford stated, "it is my medical opinion that a direct post-surgical placement at Magee Rehab Hospital for the duration of his post-surgical rehabilitation is medically necessary to reduce the risks of medical complications, provide a safe environment and facilitate a better outcome for him." ECF No. 1-1 at 5-6.

Finally, in a letter dated March 21, 2019, Dr. Shoji Ishigami, Assistant Professor at West Virginia University's Department of Neurology, opined that it was absolutely vital to restore Mr. Jenkinson's upper limbs function through high level rehabilitation in an acute, not sub-acute, rehabilitation facility such as Magee.

Highmark approved Mr. Jenkinson's request and he was admitted to Magee on April 11, 2019. Highmark's approval was based on a finding of medical necessity of the requested service. Mr. Jenkinson's estimated recovery at Magee was expected to be three to four months from the date of surgery.

Highmark's authorization of Mr. Jenkinson's continued stay at Magee was assessed on a week-to-week basis. After review by Highmark personnel, Highmark authorized Mr. Jenkinson's continued stay on April 11, April 17, April 24, May 1 and May 8, 2019. On May 15, 2019, right before Mr. Jenkinson was scheduled to have his sling

removed, Highmark verbally informed Magee that Mr. Jenkinson no longer qualified for coverage at Magee and needed to be removed to a nursing home. Highmark reasoned Mr. Jenkinson's continued stay at Magee was no longer medically necessary because Mr. Jenkinson's "progress at Magee had plateaued, and he was no longer expected to make progress at an acute in-patient rehabilitation facility." ECF No. 11 at 3-4.

On May 16, 2019, Mr. Jenkinson appealed to Highmark. While awaiting Highmark's decision, Mr. Jenkinson paid out-of-pocket for his care at Magee. On May 22, 2019, Highmark notified Mr. Jenkinson of its decision to uphold its denial. Dr. Formal, the attending physician at Magee, contacted Highmark and requested a peer to peer review to discuss Highmark's decision. Mr. Jenkinson was ultimately transferred from Magee to The Springs at Watermark ("Watermark"), a nursing home in Philadelphia, Pennsylvania.

Thereafter, on May 24, 2019, Mr. Jenkinson filed the complaint in this action seeking to recover benefits owed to him under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B) and injunctive relief to require his immediate return to Magee under § 1132(a)(3). ECF No. 1. Within his complaint, Mr. Jenkinson requested a preliminary injunction ordering his return to Magee. The Court held a hearing to address Mr. Jenkinson's request on May 30, 2019. The Court heard evidence from both parties and reserved issuing a decision until after further review.

## II. Applicable Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf, 553 U.S. 674, 689-90 (2008)). "Mandatory preliminary injunctions . . . normally should be granted

only in those circumstances where the exigencies of the situation demand such relief." Wetzel v. Edwards. 635 F.2d 283, 286 (4th Cir. 1980). To succeed on a motion for a preliminary injunction, the plaintiff must make a "clear showing" that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20, 22. "All four requirements must be satisfied." Real Truth About Obama, Inc. v. Fed. Elec. Comm'n, 575 F.3d 342, 346 (4th Cir. 2009) (vacated and remanded on other grounds).

If the court grants a motion for a preliminary injunction it must: (1) state the reasons why the injunction was issued; (2) state the injunction's terms specifically; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d)(1). Additionally, the court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In the Fourth Circuit, "this rule is mandatory and unambiguous." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999). "Although the district court has discretion to set bond amount in such sum as the court deems proper, it is not free to disregard the bond requirement altogether." Id. "[F]ailure to require bond upon issuing injunctive relief is reversible error." Id.

### III. Findings of Fact and Conclusions of Law

Here, the Court finds that an injunction is warranted because Mr. Jenkinson has made a clear showing that (1) he is likely to succeed on the merits of his claim; (2) he is

5

likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.

**A. Mr. Jenkinson is likely to succeed on the merits of his claim.**

Mr. Jenkinson seeks relief under 29 U.S.C. § 1132(a)(1)(B) to recover his out-of-pocket expenses for his care at Magee from May 16, 2019, to May 22, 2019, while he was awaiting a decision on his internal appeal of Highmark's denial of benefits. Mr. Jenkinson also seeks injunctive relief under § 1132(a)(3) to require his immediate return to Magee for the remainder of his recovery. Highmark argues that Mr. Jenkinson is not permitted to seek relief under § 1132(a)(3) because "Congress intended section [1132(a)(3)] to be a 'catchall' ERISA provision that acts 'as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1332] does not elsewhere adequately remedy." ECF No. 11 at 9 (quoting Varity Corp. v. Howe, 516 U.S. 489, 512 (1996)).

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). 29 U.S.C. § 1132, the civil enforcement section under ERISA, provides,

> (a) A civil action may be brought—
>
> (1) by a participant or beneficiary . . .
>
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable

relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

"[T]he standard of review under ERISA of a fiduciary's discretionary decision is for abuse of discretion, and we will not disturb such a decision if it is reasonable." Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000). "In general, 'a decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Hung v. Guardian Life Ins. Co. of America, 28 Fed.Appx. 268, 272 (4th Cir. 2002) (quoting Ellis v. Metro Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997)). "Our reasonableness review applies to both a [fiduciary's] factual findings and interpretations of the plan." Grabowski v. Hartford Life & Accident Ins. Co., 747 Fed.Appx. 923, 926 (4th Cir. 2018).

In order to succeed on the merits of his claim[1], Mr. Jenkinson must show that Highmark's decision violated the terms of the Plan. Upon review of the evidence and the parties' arguments, the Court finds that Mr. Jenkinson has made a clear showing that he is likely to succeed on the merits of his claim.

The plan at issue in this case "requires that all services be medically necessary and dictates that medical necessity is 'determined by qualified Highmark WV personnel.'" ECF No. 11 at 3. On May 15, 2019, Highmark determined Mr. Jenkinson's continued stay at Magee was no longer medically necessary. Highmark alleges this denial was based on the following policy terms:

> **. . . MEDICALLY NECESSARY AND APPROPRIATE (MEDICAL NECESSITY AND APPROPRIATENESS)** - Services or supplies that a Provider, exercising prudent clinical judgment, would provide to a patient

---

[1] The Court does not need to decide, for the purposes of issuing a preliminary injunction, if Mr. Jenkinson must proceed under 29 U.S.C. § 1332(a)(1)(B) or (a)(3). Under either section, to make a clear showing that he is likely to succeed on the merits of his claim, Mr. Jenkinson must show that Highmark's decision violated the terms of the Plan.

7

for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms, and that are:
   a. in accordance with generally accepted standards of medical practice;
   b. clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
   c. not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

ECF No. 11-5 at 2-3.

Highmark alleges the care at Magee is no longer medically necessary because Mr. Jenkinson's "progress at Magee had plateaued, and he was no longer expected to make progress at an acute in-patient rehabilitation facility and further noted that the 'present care plan be safely and appropriately conducted in a less intensive, alternative, setting.'" ECF No. 11 at 4. At the hearing, Highmark represented this decision was heavily based on the fact Mr. Jenkinson is not currently weight-bearing on his left arm. Highmark stood by this representation even though it authorized the first several weeks of Mr. Jenkinson's stay at Magee while he was in a sling and could not move his left arm. He is now at the point that his sling has been removed and he is able to start moving his arm with assistance.

Further, when initially authorizing his surgery and planned follow-up stay at Magee, Highmark was aware it would be approximately three months before Mr. Jenkinson would be permitted to bear any weight on his arm. This was explained in Mr. Jenkinson's letter to Highmark seeking authorization:

Dr. Abboud has already informed me that he will not permit any weight-bearing on the operative shoulder for approximately three (3) months post-surgery. This will make lengthy rehabilitation absolutely necessary and it

8

is extremely important to me that this occur at a facility that specializes in rehabilitation for a person such as me who has a spinal cord injury.

ECF No. 1-1 at 1. Highmark authorized Mr. Jenkinson's post-surgical stay at Magee with this understanding.

Nevertheless, Highmark argues Mr. Jenkinson's continued stay was assessed on a week-to-week basis and Highmark did not have a current letter from Mr. Jenkinson's treating physician because all the provided letters were prior to the surgery. However, several of the letters submitted to Highmark indicated the treatment at Magee was medically necessary for the entirety of Mr. Jenkinson's recovery. Mr. Jenkinson's letter to Highmark states: "please accept this as my specific request that you allow **all** of my post-surgical nursing/rehabilitation care to occur at Magee Rehabilitation Hospital in Philadelphia rather than a skilled nursing facility designed for the care of a more general patient population." ECF No. 1-1 at 2. Dr. Bruno, an independent consultant, wrote a letter to Highmark stating:

> The type of surgery involved will require a lengthy inpatient hospitalization in a facility that regularly cares for spinal cord injury patients with paraplegia. . . . Upon discharge from the hospital, I would caution that admission to a standard skilled nursing facility would be associated with a high risk of many problems, not just those limited to management of his bowel, bladder and skin. As an example, he would be at high risk of falling because he will not be able to transfer himself from his wheelchair to bed because his arm and shoulder would not be functional for effective transfer. . . . Therefore, when he is released from the hospital, I would strongly recommend his admission directly to Magee Rehabilitation Hospital. . . .

ECF No. 1-1 at 4. Dr. Glassford, Mr. Jenkinson's primary care physician, wrote a letter to Highmark stating:

> Obviously, this type of surgery will require a lengthy inpatient stay for Mr. Jenkinson, who is a paraplegic. This placement will be critical to the ultimate success of his surgery. Specifically, he will need to be at a facility

familiar with the care of spinal cord injured patients. . . . Most post-surgical skill nursing facilities see very few patients like Mr. Jenkinson. . . . My concern is that, if he is admitted post-surgery, to a skilled nursing facility, that he would be at an extremely high risk of multiple problems. . . . it is my considered medical opinion that a direct post-surgical admission to Magee Rehabilitation Hospital for Mr. Jenkinson for the duration of his post-surgical rehabilitation is medically necessary to reduce the risk of post-surgical medical complications, provide a safe environment, and facilitate a better outcome for him during his recovery.

ECF No. 1-1 at 5-6. Dr. Ishigami, Mr. Jenkinson's pain management physician, wrote a letter to Highmark stating:

[H]is quality of life depends on his use of the upper limbs. Therefore, it is absolutely vital to restore his function of his upper limbs through high level rehabilitation program.

ECF No. 1-1 at 7. And finally, Dr. Abboud, who performed the surgery, wrote a letter to Highmark stating:

[H]e would need to go to inpatient rehab specifically at Magee where they are familiar with his care and care for patients who are spinal cord compromise[d] on a regular basis. He would need to go there for a period of time until he is able to do transfers again using his arm, which could take up to four months.

ECF No. 1-2 at 12. While the letters are dated prior to Mr. Jenkinson's surgery, they clearly state the medical necessity for Mr. Jenkinson to stay at Magee for the entirety of his three-to-four-month recovery.

Highmark asserts Mr. Jenkinson's own treating physician did not disagree with his transfer and did not request he be moved back to Magee. Highmark alleges that "[b]oth physicians agreed that Plaintiff was not making ongoing functional progress at Magee and no longer met the definition of Medical Necessity that would require further stay at an acute rehabilitation facility" and "[b]oth agreed Plaintiff could be moved to a

Skilled Nursing Facility until such time as Plaintiff was released by his orthopedic surgeon to use his left arm in strengthening activities." ECF No. 11 at 4-5.

The evidence presented contradicts Highmark's characterization of Mr. Jenkinson's medical providers. The orthopedic surgeon's letter clearly opined Mr. Jenkinson should remain at Magee. Further, Dr. Formal, Magee's attending physician, requested a peer to peer review with Highmark.[2] If Dr. Formal agreed with Highmark's determination that Mr. Jenkinson's stay at Magee was no longer medically necessary, then he would not have requested a peer to peer review.

At the hearing, the Court asked Highmark if there was a recording of the peer to peer review conversation and, if one existed, the Court ordered that Highmark submit the recording to the Court.[3] After reviewing the recording, the Court finds the conversation failed to meet Highmark's definition—or even an average person's understanding of—a peer to peer review.

The conversation between Highmark's in-house medical professional, Dr. Warshafsky, and Dr. Formal was much more akin to a cross-examination than a peer to peer review. At the beginning of the conversation, Dr. Formal attempted to offer his opinion on Mr. Jenkinson. Dr. Formal stated that Mr. Jenkinson was "on the cusp of going back to being free, maybe not entirely, but to being free of his sling and to start working some more with the left upper extremity." Before Dr. Formal finished what he

---

[2] "The 'Peer to Peer' review process allows a plan participant's treating physician to provide additional information to one of Highmark West Virginia's reviewing physicians following a denial decision previously made with respect to a claim for benefits." ECF No. 11-6 at 2.

[3] This is a motion for expedited relief, and therefore, discovery has not yet occurred. Mr. Jenkinson did not believe that Dr. Formal agreed with Highmark's decision but did not have access to any documentation other than the affidavit and conversation notes of Gene B. Warshafsky, Highmark's physician. Therefore, the Court found, given the exigency of the circumstances, ordering Highmark to produce this recording was appropriate.

was saying, Dr. Warshafsky cut him off and took control of the conversation. Dr. Warshafsky informed Dr. Formal why Highmark did not believe that Mr. Jenkinson needed to remain at Magee and stated Mr. Jenkinson "should go to a skilled facility to just keep his maintenance of what he has until his physician releases him to start using his arm." Dr. Formal anticipated it would be a week or less before that happened. At that point Dr. Warshafsky interrupted him again. He informed Dr. Formal that Mr. Jenkinson had been at Magee for about six weeks and had not progressed. Dr. Warshafsky averred that Highmark cannot continue to cover Mr. Jenkinson's care at Magee until he is able to progress further.

Highmark misconstrues and misrepresents that Dr. Formal agreed with Highmark. At no point in the conversation did Dr. Formal agree that Mr. Jenkinson did not need to be in Magee's care or that it was appropriate to move him to a nursing home. Dr. Formal states, "what you say is true, we are avoiding complications and things like that while he is here, but he is not free yet to be using the arm." Far from a "peer to peer review," Dr. Warshafsky never meaningfully "reviewed" any information provided by Dr. Formal, rather Highmark's reviewing physician merely reiterated their pre-determined position without any consideration of Mr. Jenkinson's treating physician's opinion.

The Court also heard testimony from Mr. Jenkinson and Kelly Rankin supporting that Mr. Jenkinson's placement at Magee is medically necessary. Mr. Jenkinson testified to the treatment he is receiving at Watermark. Specifically, Mr. Jenkinson testified he is receiving occupational therapy from an occupational therapist who has never rehabbed a rotator cuff tear for anyone, much less a paraplegic, when he should

be receiving therapy from a physical therapist. Mr. Jenkinson is required to use a commode at the nursing home which places him in the position of slight weight bearing with his left arm while at Magee there is a special commode that protects him from such risk. Mr. Jenkinson must use a hoyer lift each time he needs to move somewhere, such as to shower or to use the restroom. Watermark only has a manual hoyer. Further, the certified nursing assistants at Watermark do not appear trained on using the hoyer lift to move Mr. Jenkinson safely. Also, the certified nursing assistants have indicated their hesitancy on using the hoyer lift. At Magee, however, the hoyer is mounted on tracks in the ceiling, specifically to help move spinal cord patients such as Mr. Jenkinson. In addition, the manual hoyer constrains Mr. Jenkinson's shoulder, which could compromise the surgery site.

Kelly Rankin, a physical therapist for over 22 years and himself a paraplegic for more than 13 years, testified there is a high risk of permanent harm to Mr. Jenkinson's left shoulder if he is forced to remain in the nursing home. Mr. Rankin discussed the four different phases of therapy: (1) the passive phase; (2) the active phase; (3) the strengthening phase; and (4) the return to functioning phase. Mr. Rankin testified that Mr. Jenkinson is currently in the passive phase—however, Mr. Jenkinson is not currently receiving passive phase treatment. It is at the end of the strengthening phase and during the return to functioning phase that Mr. Jenkinson will be weight-bearing and focus on transferring himself in and out of his wheelchair. Mr. Rankin opined if Mr. Jenkinson remains at the nursing home and does not transfer back to Magee, he will likely never make it to the return to functioning phase. Without proper therapy in the passive phase, Mr. Jenkinson faces a high risk of a permanent frozen shoulder, never

13

recovering full range of motion or a risk of the entire surgery being compromised, requiring him to undergo the operation again. Mr. Rankin testified to the extreme importance of the therapy done during the passive phase. Based on Mr. Rankin's testimony, the Court finds it is vital to the rest of Mr. Jenkinson's life that he immediately receive proper acute rehabilitation at a specialized facility such as Magee. Importantly, Mr. Rankin testified that Mr. Jenkinson's placement at Watermark is not at least as likely to produce equivalent results to Magee.

Highmark argued that Mr. Jenkinson needs to provide three things to return to Magee: (1) a request for authorization to go back to Magee from Watermark; (2) clinical notes since the May 22, 2019 appointment with the orthopedic surgeon; and (3) either a call with the surgeon or notes from him explaining why Mr. Jenkinson is ready for acute rehab when he is still non-weight-bearing on the left arm. The Court asked Highmark why it is suddenly relevant Mr. Jenkinson be weight-bearing to receive care at Magee when Highmark approved the first several weeks at Magee when he was in a sling.[4] Highmark did not give a clear answer. Mr. Jenkinson expressed a concern that Highmark will continue with a series of ever evolving reasons why he will never be approved to return to Magee and he will be in the same position he was previously in, requesting a preliminary injunction before this Court. The Court shares the same concern, and, as is detailed in the complaint and through testimony, time is of the essence for Mr. Jenkinson to receive the proper level of care.

Mr. Jenkinson has set forth sufficient evidence to prove that Watermark is not equipped to adequately care for him. Mr. Jenkinson has serious and specific medical

---

[4] The Court took up another pending matter to allow the Parties to confer to see if the evidence presented met the requirements for coverage set forth by Highmark and potentially resolve the dispute, but upon returning to the record on this matter Highmark's position remained unchanged.

14

issues requiring specialized medical and rehabilitation services to be performed at a specialized facility equipped to care for spinal cord injury patients. Mr. Jenkinson is at a high risk for skin, bowel and bladder issues in a nursing home setting. Furthermore, the risk of him falling in this setting is immense. Failure to receive medically necessary care immediately could ultimately affect his ability to return to work, to care for himself or ultimately recover at all from the surgery.

Mr. Jenkinson has made a clear showing his placement at Magee is medically necessary under the terms of the Plan and that Highmark's decision to deny coverage at Magee violated the terms of the Plan. Therefore, the Court finds that Mr. Jenkinson is likely to succeed on the merits of his claim.

**B. Mr. Jenkinson is likely to suffer irreparable harm in the absence of preliminary relief.**

Next, the Court finds that Mr. Jenkinson is likely to suffer irreparable harm in the absence of preliminary relief because damages involving his safety and health are immeasurable and irreparable.

Highmark alleges Mr. Jenkinson merely faces financial harm because if he elects to seek care at Magee at his own expense this can be recovered later by filing a claim of benefits. Mr. Jenkinson did pay the out-of-pocket costs incurred at Magee from May 16, 2019, to May 24, 2019, while attempting to resolve this dispute short of litigation. However, Mr. Jenkinson faces irreparable physical harm because continued treatment without coverage would bankrupt him before he completed recovery. Mr. Jenkinson's potential physical harm, not financial harm, concerns the Court for purposes of assessing irreparable harm in the absence of preliminary relief. Due to the high cost of

the necessary specialized treatment Mr. Jenkinson requires, this is not a situation where Mr. Jenkinson can afford to pay now and sue later.

Highmark further argues that Mr. Jenkinson cannot establish physical harm because he has not been denied treatment or service. Highmark states it authorized his admission to a nursing home capable of caring for him. However, as the Court already determined above, the nursing home is not a facility equipped to adequately care for Mr. Jenkinson due to his disability. Mr. Jenkinson is at a high risk for skin, bowel and bladder issues in a non-specialized nursing home setting. He is also at a higher risk for falling. He could ultimately face a permanent frozen shoulder or the integrity of the surgeon's repair could be compromised, forcing him to undergo the operation again. Such complications could ultimately affect Mr. Jenkinson's ability to return to work, care for himself or even recover at all. If the possible negative outcomes occur, no amount of money would adequately compensate Mr. Jenkinson for the effect this could have on his future health and quality of life. As testified to by Mr. Rankin, Mr. Jenkinson is required to move 185-190 pounds with his arms all day long. Therefore, if he does not receive the proper treatment now, his whole life will change for the worse.

Accordingly, the Court finds that Mr. Jenkinson is likely to suffer irreparable harm in the absence of preliminary relief.

**C. The balance of the equities tips in Mr. Jenkinson's favor.**

Third, the Court finds that the balance of equities tips in Mr. Jenkinson's favor. Mr. Jenkinson's safety and health will be at risk if he is not transferred back to Magee. This could prolong his recovery and impose a threat to his ultimate recovery. If Mr. Jenkinson's left shoulder does not heal properly and without complications, he may not

be able to return to work or care for himself alone as he has for the past three decades since his spinal cord injury. Highmark, on the other hand, would be faced with the burden of paying for care it alleges is not covered under the Plan. Highmark can seek monetary damages to fully recover the cost of Mr. Jenkinson's care if it prevails at trial.

Accordingly, the Court finds that the balance of the equities tips heavily in Mr. Jenkinson's favor.

### D. An injunction is in the public interest.

Finally, the Court finds an injunction is in the public interest. The public has a strong interest in health insurance companies providing medically necessary treatment on a timely basis. Further, the public has an interest in properly informed coverage decisions in the best interest of the insured and insurance companies upholding insurance policy terms.

Accordingly, the Court finds a preliminary injunction is in the public interest.

## IV. Conclusion

For all the reasons provided herein, the Court finds that a preliminary injunction is warranted. Specifically, the Court **GRANTS** the Plaintiff's Request for a Preliminary Injunction [ECF No. 1] because Mr. Jenkinson made a clear showing: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. Having granted the injunction, the Court will define the terms of the injunction and set an appropriate bond.

First, with respect to the **terms of the injunction**, the Court **ORDERS** that the Defendant, Highmark, is enjoined and required to immediately authorize the Plaintiff,

Mr. Jenkinson, to return to Magee Rehabilitation Center as soon as he is medically cleared by swab test results to do so and until such time as Mr. Jenkinson's Magee physicians and Mr. Jenkinson's orthopedic surgeon determine such treatment is no longer medically necessary. Highmark is **ORDERED** to provide coverage and pay costs for Mr. Jenkinson's stay at Magee subject to any provider agreement which Highmark may have with Magee.

Next, with respect to **bond**, the parties did not provide argument at the preliminary injunction hearing on this issue. The Court sets a surety bond in the amount of $18,700.00. Due to lack of argument, the parties are **GRANTED** leave to file additional evidence with the Court regarding the proper bond amount. Should either party file additional evidence on the issue of bond, the injunction will remain in full force and effect.

The Clerk is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** June 3, 2019

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE